## Meyers v. Epstein

*Irving W. Coleman,* for plaintiff.
*Morris Efron,* for defendant.

SCHEIRER, J., August 31, 1965.—In this action in equity, plaintiff seeks specific performance of an option to purchase real estate known as 640 Union Boulevard, Allentown, Pa. The option is contained in a lease between defendant and Paula M. Horton, and plaintiff claims to be an assignee of the option. The property formerly was utilized as a bakery and, since the date of the lease, as a restaurant and nightclub.

The pleadings consist of a complaint, a preliminary objection in the nature of a demurrer, which was sustained, a rule to permit plaintiff to file an amended complaint, a preliminary objection to the rule, an amended complaint, an answer and new matter, a reply, an amended answer and an amended reply to new matter. Hearings were held June 29 and 30, 1964, and January 2, 1965. A record of over 500 pages was produced, considerably prolonged by lengthy statements of counsel and colloquies with the court. Argument was heard on requests for findings of fact and conclusions of law.

From the admissions in the pleadings, from the testimony and from the exhibits, the chancellor makes the following

### FINDINGS OF FACT

1. On January 30, 1958, David Epstein and Paula M. Horton executed a lease for premises 640 Union Boulevard, Allentown, Pa., for a term of five years, commencing February 15, 1958, and ending February 14, 1963.

2. In the said lease, it is recited that the rental was to be $10,000 per year, payable in advance on or before January 1st of each year.

3. Said lease contained an option in favor of the lessee to purchase the land and buildings thereon for $110,000 net, at the expiration of the first year of the lease, or any time thereafter during the life of the lease, upon giving the lessor 60 days prior notice, in writing,

by registered mail, of lessee's intention to exercise the said option.

4. On January 31, 1958, Philip Neuweiler executed an instrument guaranteeing Paula Horton's obligations under the aforesaid lease.

5. On January 31, 1958, Paula M. Horton and Harry P. Creveling, Esq., attorney for Philip Neuweiler, entered into an agreement, wherein it was recited that Harry P. Creveling had loaned $10,000 to Paula M. Horton and, in consideration of $1 and the premises, the latter assigned all her right, title and interest to the option to Creveling. Defendant gave his approval and consent to the said assignment on the same instrument.

6. Harry P. Creveling, Esq., did not loan $10,000 to Paula M. Horton, but took the assignment of the option as security for his client, Philip Neuweiler, who advanced $10,000 for the first year's rent.

7. Harry P. Creveling, Esq., has neither exercised the option nor relinquished his right, title and interest therein.

8. Harry P. Creveling, Esq., acknowledged that as recently as August 1962, he still held the option assigned to him by Paula Horton on January 31, 1958.

9. Harry P. Creveling represented Paula M. Horton and Philip Neuweiler at the time of the execution of the lease and later represented Alpine Villa, Inc.

10. On September 17, 1958, Paula M. Horton assigned all her right, title and interest in the lease to Alpine Villa, Inc., in which corporation she held a 99 percent interest.

11. On December 17, 1962, Paula M. Horton, in behalf of Alpine Villa, Inc., gave written notice to defendant of a desire to exercise the option to purchase contained in the lease and requested a settlement date.

12. On December 17, 1962, Paula M. Horton, individually, and Alpine Villa, Inc., "assigned" all their right, title and interest in the lease and option to purchase to plaintiff.

13. On November 16, 1959, David Epstein, lessor, wrote to Alpine Villa, Inc., lessee, to the effect that the method of rental payment would be changed from an annual basis of $10,000 per year to a monthly rental payment of $833.33.

14. Under the provisions of the lease, the lessee was obligated to pay real estate taxes before the due date without penalty, as well as insurance premiums.

15. During the latter half of 1962, Alpine Villa, Inc., was delinquent in the payment of rent, taxes and insurance premiums.

16. On August 6, 1962, defendant notified Alpine Villa, Inc., that the lease was in default and cancelled due to the latter's failure to pay rent and insurance premiums.

17. On December 6, 1962, defendant notified Alpine Villa, Inc., that unless receipted tax and insurance bills were submitted within 10 days, as well as overdue rent, the lease would be cancelled.

18. On December 31, 1962, defendant wrote the following to Alpine Villa, Inc.:

"You have not cured the defaults as per my letter dated December 17, 1962.

"You are, therefore, hereby notified that your lease on the aforementioned premises is cancelled and is now null and void, and you are ordered to vacate the premises.

"If within ten (10) days from the date hereof we do not receive the rental due for the month of December, 1962 and paid receipts for the County, City and School Taxes for the Year of 1962, we shall be forced to take appropriate legal action."

19. Defendant's letter of December 17, 1962 to Alpine Villa, Inc., was dispatched prior to the receipt of the written notice by Alpine Villa, Inc., of the desire to exercise the option.

20. On December 17, 1962, one month's rent in the

sum of $833.33 was due and unpaid, as well as 1962 real estate taxes in the sum of $1,770.17, with interest and penalties totalling $88.49.

21. On January 29, 1963, defendant entered judgment on the lease for delinquent rent and taxes which with a five percent collection fee totalled $3,608.69.

22. An execution was issued out of the Court of Common Pleas of Lehigh County, Pa., at the suit of David Epstein v. Paula M. Horton and Alpine Villa, Inc., to judgment no. 618, January term, 1963, execution no. 25, April term, 1963, and a levy made upon the personal property and equipment of Alpine Villa, Inc. There was a sheriff's sale on February 11, 1963, and the property was bid in for the sum of $11,200 by Norman Meyers, plaintiff herein. On October 22, 1963, there was distributed to David Epstein the sum of $3,608.69.

23. Gerald Roth, Esq., who represented plaintiff in the latter part of 1962 and instituted the within action in 1963, did not contact defendant with reference to the assignment of the option to plaintiff between December 17, 1962 and February 13, 1963. On the latter date, plaintiff requested Roth to write to defendant.

24. Plaintiff did not notify defendant of his ownership of the option, nor of his desire to exercise it between December 17, 1962, and January 7 or 8, 1963. On one of these latter dates, plaintiff told defendant by telephone that since cash was demanded rather than a purchase money mortgage, he was not interested in purchasing the real estate.

25. At the sheriff's sale on February 11, 1963, plaintiff spoke to defendant concerning his desire to purchase the premises but defendant refused to do business with him.

26. On February 5, 1963, defendant entered into a lease with William Bunderla providing for an an-

nual rental of $12,000 and granting an option to purchase the premises for the sum of $150,000.

27. On January 31, 1958, Harry P. Creveling, Esq., delivered a letter to Paula M. Horton agreeing that, in the event he exercised the option which had been assigned to him, he would grant an option to her to purchase the said premises for $110,000.

28. Plaintiff has never tendered $110,000 or any other amount to defendant to purchase the said premises.

29. Plaintiff was not financially able to pay $110,-000 in cash to purchase the said premises.

## DISCUSSION

In order to succeed in this action, plaintiff must prove initially that he was in fact the owner of the option allegedly assigned to him on December 17, 1962, by Alpine Villa, Inc., which corporation, by its president, had on the same date given notice to defendant of its desire to exercise the option. Defendant sets up the defense that neither Alpine Villa, Inc., nor plaintiff had any right, title and interest in the option because on January 31, 1958, it had already been assigned to Harry P. Creveling, Esq., by the original lessee, Paula M. Horton. Plaintiff's counsel counters this defense in the following language:

"It is the contention of the Plaintiff that from the construction of the lease and from the intentions of the parties, the lease and the option to purchase embodied therein are one instrument, not separable, because the consideration for the option to purchase and the consideration for the lease are one and the same."

The proposition that a lease and an option in the same instrument are not separable when the consideration for the option and the lease are the same is not tenable. It has frequently been held in this Commonwealth that an option is an independent contract which is not extended by a renewal of the lease. In Pettit v.

Tourison, 283 Pa. 529, where there was no separate consideration for the option to purchase, the court said:

"The option to purchase is not an essential covenant of the lease, nor is it a term and condition of the demise. There are many covenants which are often found in leases which are independent and not essential parts of the demise, which, without express agreement to that effect, are not to be incorporated in renewals thereof, such as a covenant to renew or any covenant that has been fulfilled and is not continuous."

And further:

"The option to purchase is an independent clause in the lease, giving the lessee the right to purchase the property within the time specified: Signor v. Keystone Consistory, 277 Pa. 504. It may be treated as a part of the agreement in so far as it describes the persons and the property, but it forms no part of the demise and was not necessary for the continuance of the tenancy."

Judge Laub, in Felver v. Baumgarten, 35 Erie 91, referred to the Pettit case and others as follows:

"The Pettit case, for example, in clear and unambiguous language, divorces an option to purchase contained in a lease from the demise itself and holds that the former is an independent covenant, not essential to the latter and referable to it only in so far as it describes the persons and the property. So too, Parker vs. Lewis, 267 Pa. 382, succinctly decided that a lease containing an option to purchase which had been renewed 'under the same conditions' constituted a renewal of the lease terms only and not those of the option. And Signor vs. Keystone Consistory A.A.S.R., 277 Pa. 504, is to the same effect, holding that an option is an independent contract which is not extended by a renewal of the lease. Kentucky, at least, seems to be in accord with our law. See Carter vs. Frakes, 303 Ky. 244, 197 S.W. 2d 436."

No separate consideration for the option appears in Felver.

In Klugh's Estate, 63 York 5, the court commented:

". . . The option to purchase is an independent clause in the lease; it forms no part of the demise, and is not necessary for the continuance of the tenancy; *although the lease may constitute consideration for the option.* . . ." (Italics supplied.)

The following statements quoted with approval in Richter v. Mozenter, 356 Pa. 650, 653, 53 A. 2d 76, 78, make it manifestly clear that the consideration for a lease is adequate consideration for an option contained therein.

"The lease, executed contemporaneously with and pursuant to the terms of the said agreement of sale, contained the option to purchase. 'It is not necessary that the consideration shall have been given exclusively for the option. It is enough if it is one term of a contract for which consideration was given. Thus, an option in a lease or in another instrument given contemporaneously with a lease and as part of the same transaction, may be specifically enforced:' 5 Williston, Contracts, page 4026.

"If it be assumed that the option to purchase, if alone bargained for, might not have been supported by consideration, that fact could not avail appellant. Certain it is that there was consideration for the lease itself. The option being a term thereof, was binding and enforceable. 'Consideration is sufficient for as many promises as are bargained for and given in exchange for it if it would be sufficient . . . (b) for at least one of them, and its insufficiency as consideration for any of the others is due solely to the fact that it is itself a promise for which the return promise would not be a sufficient consideration': Restatement, Contracts, section 83."

There seems to be a paucity of cases in Pennsylvania

on the assignability of an option apart from the lease However, other jurisdictions provide authority for the right and, we think, convincingly.

In Holmes v. Harris, 33 N. J. Super. 395, 110 A. 2d 329, when it was argued that there was no privity between the lessor and the assignee of the option, the court responded:

"The misapprehension dissolves when it is recognized as it is in this jurisdiction that an option to purchase the demised premises such as this constitutes a covenant independent and separable from the lease as such, and in the absence of a negative provision the option is as assignable as any other contractual right. (Citing cases.) An option is a right which, by its inherent nature, is incapable of being leased. It is a right granted to the lessee of an essentially different character than that of the letting, although perhaps frequently it is a component of the transaction in its entirety.

"Absent a prohibitory or restrictive contractual restraint, both a lease and the option to purchase thereby conferred are assignable and may be specifically enforced in equity at the suit of the assignee."

The California Supreme Court could see no injury to the lessor by receiving the purchase price from the optionee's assignee rather than from the optionee. "Inasmuch as the contract contains no features of personal trust or confidence reposed in any of the parties and requires nothing more than a mere routine of paying money, it is assignable. (Cases cited.) The option provision is clearly severable from all other provisions of the lease . . ."

In the absence of a provision making the exercise of the option personal to the lessee, there should be no reason why the option may not be separated from the lease and transferred by the lessee: Spaulding v. Yovino-Young, 30 Cal. 2d 138, 180 P. 2d 691. If the

parties intend to limit the exercise of the option to the lessee, such intention could be declared in the instrument. The absence of such a provision logically leads to the conclusion that no such restriction was intended.

We find, therefore, that merely because the consideration for the lease and the option are the same does not a fortiori make them not separable, nor in the absence of a contrary intention make the option nonassignable. The parties to the lease practically contemporaneously with its execution showed a clear intention to make the option assignable apart from the leasehold, Paula Horton by requesting Attorney Creveling to prepare such an assignment and thereafter executing it and defendant by affixing his consent and approval thereon. It should be noted that the assignment was dated January 31, 1958; the lease was dated January 30, 1958. Plaintiff cannot complain because his rights can rise no higher than his assignor's rights.

We permitted plaintiff, over the objection of defendant, to present testimony attacking the assignment to Creveling on the ground that it lacked legal consideration. Defendant's position was well taken, as plaintiff did not aver lack of consideration in his pleadings. The evidence must be limited to the issues in the pleadings: 4 Standard Pa. Prac. 475; Real Estate Co. of Pittsburgh v. Rudolph, 301 Pa. 502. Further, plaintiff chose not to amend. We hasten to add that plaintiff, having assumed to attack the assignment for lack of consideration, has not met his burden of proof. The statement in the assignment that Paula Horton was indebted to Creveling in the sum of $10,000 was factually incorrect, but the credible evidence was that Creveling was Philip Neuweiler's attorney as well as Paula Horton's, and that Neuweiler advanced the first year's rent. In addition, Neuweiler, in writing, guaranteed Paula Horton's obligations under the lease. Creveling acted as Neuweiler's agent in the transaction and took the

assignment as security for Neuweiler's advancement of rent and possible future obligation to defendant. Creveling's statement that he took the assignment only because Mrs. Horton requested it was an oversimplification of the situation and an apparent effort to keep Neuweiler's name out of the case. Other witnesses, not having the same concern, provided the facts above referred to.

Plaintiff, in his reply to new matter, averred that Creveling "orally renounced" the option to Paula Horton. No evidence was adduced to substantiate this averment. In fact, Creveling, when questioned whether he told defendant in August 1962 that he still owned the option, testified: "As far as I was concerned at that point, I think on the record I had the option". Nothing appears in the testimony to the effect that Creveling renounced the option after August 1962. It is also obvious that Paula Horton neither individually nor as president of Alpine Villa, Inc., by any unilateral conduct such as an attempted exercise of the option on December 17, 1962, could void the outstanding option in Creveling. Defendant quoted Mrs. Horton as telling him after December 17, 1962, that Creveling would not surrender the option. The fact that Creveling accompanied plaintiff and Mrs. Horton to a local bank in the spring of 1962 purportedly so that "they" could secure financing to purchase the premises is not evidence that Creveling renounced his option; he was Mrs. Horton's counsel and may have been present to advise and guide her. Even if Creveling attempted to assist Mrs. Horton to purchase the premises, this would not, of itself, mean an abandonment of his option in view of the reason for the assignment to him originally. The fact that plaintiff was present is immaterial, for, at this early date, he had no legal standing whatsoever in relation to the option.

Plaintiff could not, therefore, acquire the option from

Alpine Villa, Inc., on December 17, 1962, since Mrs. Horton on January 31, 1958, had assigned it to Attorney Creveling, who had not relinquished his interest therein up to the 1962 date.

Defendant introduced testimony that plaintiff, in a telephone conversation with him and his son on either January 7 or 8, 1963, said, upon being informed that defendant would accept only cash for the premises and not a purchase money mortgage, that he did not desire to purchase the premises. Defendant argues that, following this conversation, he entered into negotiations with William Bunderla and on February 5, 1963, entered into a lease with him for the premises in question. Defendant claims plaintiff is estopped to seek specific performance of the option and pleaded the facts as to an estoppel in new matter. Plaintiff meets this argument by attacking the credibility of defendant and his son. We have no reason to disbelieve defendant and his son, especially in the light of plaintiff's evasive and uncertain testimony as to the incident and the almost unexplainable conduct of himself and his then counsel in relation to the avowed exercise of the option on December 17th and the so-called assignment to plaintiff on the same date. While the "assignment" to plaintiff was recorded at 4:06 p.m. on December 17, 1962, the approach to defendant thereafter concerning the assignment was characterized by silence. It is strange that defendant would call Mrs. Horton after December 17th, not plaintiff, in reference to meeting the requirement of making lease payments current if she wished to exercise the option.

Equitable estoppel "is intended to prevent a party from denying the truth or accuracy of that which he has previously asserted or from assuming a position or asserting a right to another's disadvantage inconsistent with a position previously taken. The doctrine is based upon the principle that a person is held to a

representation made or a position assumed when otherwise inequitable consequences would result to another who, having the right to do so under the circumstances, has in good faith relied thereon": 14 P. L. Encyc., §21, page 189.

An equitable estoppel rests on statements of fact while a promissory estoppel rests upon a promise to do something in the future. The Supreme Court commented on the latter as follows:

"Its most frequent application has been to cases in which a person announces his intention of abandoning an existing right, and thereby leads another, relying thereon, to some action or forbearance. Such cases have sometimes been referred to as well-recognized exceptions to the general proposition that, in order to give rise to an estoppel, a representation must relate to an existing fact and not be merely an expression of opinion or a promise of future performance. 'There is no rule more necessary to enforce good faith than that which compels a person to abstain from enforcing claims which he has induced others to suppose he would not rely on. The rule does not rest upon the assumption that he has obtained any personal gain or advantage, but on the fact that he has induced others to act in such a manner that they will be seriously prejudiced if he is allowed to fail in carrying out what he has encouraged them to expect': Faxton v. Faxon, 28 Mich. 159, 161": Fried v. Fisher, 328 Pa. 497.

The same principle is stated in Restatement, Contracts, §90, as follows:

"A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."

Under the facts of the case, we feel that a promissory

estoppel has been established by clear, precise and un-equivocal evidence. The effect of plaintiff's statement to defendant was that he would not exercise his option, that he abandoned an existing right, and, by using the latter term, we do not reject the position earlier taken that plaintiff never owned the option. The point is, plaintiff abandoned whatever right he had or thought he had and defendant relying on such assertion entered into negotiations with Bunderla for a new lease. See Shive v. Bollinger, 54 York 17, where the optionee advised the optionor he did not wish to purchase the property, and Pennell v. Foor, 64 D. & C. 491, where the situation of a tenant notifying the landlord of a desire not to rerent is discussed. To enforce plaintiff's claim after he renounced it would seriously prejudice defendant.

While the chancellor rests his adjudication on two grounds, (1) plaintiff never having acquired the option cannot enforce it, and (2) he renounced whatever right he had in the option, he notes two other defenses raised by defendant. Defendant asserts that the option could not have been effectively exercised because, on December 17, 1962, Alpine Villa, Inc., was in default under the lease. It is admitted by the parties that on December 17th substantial 1962 real estate taxes were unpaid by the lessee in violation of a lease obligation. Further, a strong inference can be made that insurance policies were cancelled due to the lessee's failure to pay the premiums. It is argued by defendant that two months' rent was owing on December 17th while plaintiff takes the position for reasons immaterial here that no rent was owing. Our independent finding based on defendant's records and his letter to Alpine Villa, Inc., dated December 31st, is that one month's rent was unpaid. There was a history of defaults of rent during the term of the lease and especially in the latter part of 1962. However, the question is whether the lease was

in effect on December 17th. On December 31, 1962, defendant wrote as follows:

"You have not cured the defaults as per my letter dated December 17, 1962.

"You are, therefore, hereby notified that your lease on the aforementioned premises is cancelled and is now null and void, and you are ordered to vacate the premises.

"If within ten (10) days from the date hereof we do not receive the rental due for the month of December, 1962 and paid receipts for the County, City and School Taxes for the Year of 1962, we shall be forced to take appropriate legal action."

On August 6, 1962, defendant also wrote that because of delinquency of rent payments and insurance premiums "you are hereby notified that the lease between us dated the 30th day of January, 1958 . . . is in default and is hereby cancelled."

Apparently, defendant "cancelled" with the hope of collecting rent, etc. But, the letter dated December 31st assumes that the lease prior thereto was not canceled. Defendant contends that certain provisions of the lease permitted an automatic termination. Without quoting these clauses, we express a doubt that they can be interpreted as bringing about a forfeiture. The reason is found in the following expression of the Supreme Court:

"In Pennsylvania we have consistently followed the strict common-law rule that unless a demand for rent is expressly waived by the terms of a lease a demand by the lessor is absolutely essential to work a forfeiture thereof for nonpayment of rent. As stated in McCormick v. Connel, 6 S. & R. 151, 152, 153, 'Where there is a condition of re-entry on nonpayment of rent, several things are required by the common law, to be previously done, to entitle the reversioner to reenter. *There must be a demand of the precise rent due on the*

*very day on which it becomes due,* on the most notorious place on the land, and a demand must in fact be made on the land, although there should be no person on the land ready to pay it. Duppa v. Mayo, 1 Saund. 287, note. 16. This part of the common law has been adopted by us in our own common law; Stoever v. Lessee of Whitman, 6 Bin. 416, 419' ": Elizabethtown Lodge No. 596 v. Ellis, 391 Pa. 19, 137 A. 2d 286.

The court continued to say: "It is only in cases in which the contract of lease contains an express waiver of demand that the common-law rule can be disregarded." We find no such express waiver of demand in the lease before us.

If our conclusion seems harsh to defendant in view of the lessee's clear default, we reiterate two principles also enunciated in the Elizabethtown case. Firstly, defendant must be bound by a strict construction of the terms of the lease on the doctrine that forfeitures are odious and must be strictly construed. Secondly, if a provision in a lease is ambiguous, it must be construed most strongly against the landlord and in favor of the tenant, especially when the lease was prepared by the lessor, as was the case here. We agree with the established principle that where the consideration for the lease and the option are the same and the rental payments are in default and a cancellation of the lease takes place, the option falls with the lease. But, we cannot find, as defendant requests, that the lease between defendant and Alpine Villa, Inc., was cancelled on December 17, 1962.

Defendant finally contends that ". . . a tender of performance on the part of plaintiff is prerequisite to a decree for the specific performance of a contract for the sale of real estate". See Heights Land Company v. Swengel's Estate, 319 Pa. 298. Defendant correctly points out that plaintiff never tendered the purchase price and that he has not shown himself as ready, will-

ing and able. Plaintiff replies that defendant's conduct excused both the requirement of tender and of showing himself "ready, willing and able." There is a gray area between the alleged assignment to plaintiff on December 17, 1962, and plaintiff's renouncement of the option on January 7 or 8, 1963. Plaintiff and his then counsel were silent as to plaintiff's ownership of the option and defendant either not knowing of plaintiff's interest or desiring not to do business with him continued to deal with Alpine Villa, Inc., on matters relating to the lease. Accordingly, and because of our reliance on other grounds, we do not consider it necessary to determine this issue. For such value as it may have to the parties, we have no hesitation in finding that plaintiff having assumed the burden of showing himself as ready, willing and able has not done so successfully. The heart of his proof lies in a purported letter of commitment of financing by a Philadelphia concern. This letter secured a few days prior to hearing was predated December 8, 1962, written on stationery of a defunct law firm and signed by an office secretary without authority. The letter was secured by a broker for plaintiff, but the "commitment" was by a firm whose representatives could find no evidence of a commitment in the files. At best, according to the broker, the "commitment" was informal. The circumstances incident to the preparation of the letter of commitment, the time of its preparation and its brash use to prove what plaintiff called "a firm commitment" all leave something to be desired in a court of equity. The reflection from this incredible presentation on plaintiff's other testimony was not conducive to belief. Also, there is no proof that plaintiff ever showed himself to defendant to be "ready, willing and able."

It is apparent from reading the record that plaintiff's entry into the option picture came at a time when Alpine Villa, Inc., was in financial difficulty. The "as-

signment" to plaintiff was given contemporaneously with the notice to defendant of Alpine Villa's election to exercise the option. Plaintiff was not an outsider who acquired an "option" on the open market; he was an intimate of Mrs. Horton. Plaintiff claimed the consideration for the option was his payment of some of Alpine Villa's obligations, though this was not corroborated. It was most unusual for plaintiff or his attorney not to contact defendant after December 17, 1962, informing him of his "ownership" of the option. Recording the assignment was not notice to defendant as required under the lease. True, Alpine had given notice by registered mail but we have the impression that the paper work between Mrs. Horton and plaintiff was in the nature of a maneuver at a critical stage in the relations between Alpine and defendant and not a forthright business transaction. This background is evident from the testimony. We are prompted to use the language of Justice (now Chief Justice) Bell in Mrahunec v. Fausti, 385 Pa. 64, 121 A. 2d 878.

"A decree for specific performance is not a matter of right but a matter of grace, and will not be granted unless plaintiff is clearly entitled thereto, and there is no adequate remedy at law, and the Chancellor believes that justice requires it."

And further,

"Plaintiff's case fails for the additional reason that he falls within the well established principle, viz., where plaintiff has the burden of proving certain facts he cannot recover if his evidence is so uncertain or inadequate or equivocal or ambiguous or contradictory as to make findings or legitimate inferences therefrom a mere conjecture."

Plaintiff's prayer for specific performance must be denied.

We have made findings of fact beyond those required for the adjudication, so that the parties and counsel

may have the benefit of the chancellor's impression of some contested questions of fact. We have refused some findings requested by both parties not essential to the adjudication or not substantiated by the evidence. Some requests have been rephrased.

We make the following

### CONCLUSIONS OF LAW

1. The court has jurisdiction over the subject matter and the parties.

2. Consideration for a lease may also constitute consideration for an option to purchase contained therein. The option to purchase in the lease from defendant to Paula Horton dated January 30, 1958, was an independent contract and, absent an intention to restrict its exercise to the lessee, could be assigned apart from the leasehold.

3. Paula Horton's assignment of the option to Harry Creveling, Esq., with the consent of defendant, was a valid assignment.

4. Because of the valid prior assignment of the option to Harry Creveling, Esq., Paula Horton's assignment on September 17, 1958, of her remaining right, title and interest in the lease to Alpine Villa, Inc., did not create any rights in said corporation with respect to the option.

5. Because Alpine Villa, Inc., never acquired title to the option, its attempt to exercise the same on December 17, 1962, was a nullity.

6. Plaintiff is estopped to enforce the purchase option because of his statement to defendant on January 7 or 8, 1963, that he did not desire to purchase the premises, which statement induced defendant to lease the premises to William Bunderla.

7. Plaintiff is not entitled to specific performance.

5. The following will be entered as the

### DECREE NISI

And now, August 31, 1965, it is ordered and decreed

that plaintiff's complaint be dismissed. Costs to be paid by plaintiff.

Now, August 31, 1965, the foregoing adjudication and decree nisi are ordered filed, and if no exceptions are filed within 20 days after notice of such filing has been given respective counsel, the decree nisi shall be entered as the final decree in the case.